F.2d 1250 (5th Cir. 1969), cert. denied, 399 U.S. 927, 90 S.Ct. 2239, 26 L.Ed.2d 792 (1970), the Court stated:

"While [49 U.S.C. § 1471(a)] concerns a penalty, it is civil in nature and when it is enacted and the implementing regulations adopted to promote the public good, a reasonable preponderance of the evidence is sufficient to sustain the government's burden of proof. *United States v. Proper*, 7 Aviation 18.173 (D.C.N.Y. 1962)."

14. Plaintiff has established by a preponderance of the evidence that Ms. Burns carried an unauthorized weapon aboard defendant's Flight No. 893. Plaintiff has also established by a preponderance of the evidence several facts surrounding the screening of passenger Burns which lead the Court to find that defendant's security screener was negligent in his inspection of Ms. Burns' shoulder bag.

(a) Most significant is the fact that another security screener at the St. Louis International Airport found the weapon while conducting an identical search later on the same day.

(b) In addition, the size of the purse and the gun make it apparent that a reasonably careful search would have discovered the weapon.

15. Accordingly, the Court finds that defendant has violated 49 U.S.C. § 1430 and 14 C.F.R. § 121.538, and is thereby liable for a civil penalty under 49 U.S.C. § 1471. A penalty of $500.00 will be imposed on defendant.

Raymond G. LASKY et al., Plaintiffs,

v.

Sheriff Lawrence QUINLAN et al., Defendants.

No. 73 Civ. 1666 (HFW).

United States District Court, S. D. New York.

June 21, 1976.

Jack P. Levin, New York City, for plaintiffs; Sara E. Steinbock, Jon Yard Arnason, New York City, of counsel.

Peter L. Maroulis, Poughkeepsie, N. Y., for defendant Quinlan.

James D. Benson, County Atty. of Dutchess County, Poughkeepsie, N. Y., for defendants Farmer, Boyce, Smith & Callinan; James M. Fedorchak, Chief Asst., Poughkeepsie, N. Y., of counsel.

## OPINION

WERKER, District Judge.

This action was commenced against the Dutchess County Sheriff, the Head Jailer and other Jailers alleging violations of various constitutional rights as well as a violation of 42 U.S.C. § 1983. Only injunctive relief was sought. The Honorable Murray I. Gurfein, then United States District Judge, now Judge of the Court of Appeals for the Second Circuit, to whom this case was assigned held a hearing with respect to the allegations in the complaint on July 2, 5 and 6, 1973. Thereafter, at the suggestion of Judge Gurfein, counsel for the plaintiffs and counsel for the defendant Sheriff got together and entered into a stipulation dated July 25, 1973 with respect to the improvements needed in the jail which the defendant Sheriff agreed to implement. Judge Gurfein on July 30, 1973, entered an opinion and order approving the stipulation which had been entered into between counsel for the respective parties. He stated in that opinion, "The action is dismissed upon the stipulation being filed, subject to reopening or the institution of contempt proceedings in the event of a wilful failure to comply with the aforementioned order of the court."

On December 8, 1975, counsel for the plaintiffs moved to hold the Sheriff in contempt on grounds involving the non-compliance with the stipulation and the order of Judge Gurfein and this matter was reopened. A hearing with respect to the allegations made in the motion to hold the Sheriff in contempt was held on February 3, 4, 5 and 6, 1976 at Poughkeepsie, New York.

As required by Rule 52 of the Federal Rules of Civil Procedure, I make the following findings of fact and conclusions of law based upon the testimony given and the documentary evidence received at that hearing.

In the 29 months following the entry of Judge Gurfein's order plaintiffs' counsel repeatedly requested the Sheriff and his counsel to provide him with evidence showing compliance with the stipulation and order.

The Sheriff and his counsel were notified that failure to comply with the terms of the

stipulation would result in a motion to find the Sheriff in contempt.

No application throughout the period was made to this court to relieve the Sheriff of any obligations assumed under the stipulation and order or to clarify the same.

### 1. Classification of Inmates

The stipulation required that persons detained for trial or examination should not be kept in the same room as convicts under sentence. It also required that minors be separated from adults. I find that the Sheriff has failed to make the necessary classification of inmates; indeed upon the hearing, the court was required to direct the Sheriff to remove from the Dutchess County Jail such inmates who were not within classification.

There was considerable testimony that unsentenced inmates were often housed with those who had already been sentenced. On January 13–16, 1976, at a time when the jail population was low enough to permit proper classification, Mr. Swiderik, a senior investigator for the New York State Commission of Correction found five violations of the classification requirements during an inspection. Entries in the diary of James Montross, deputy sheriff for the Dutchess County Jail, indicated at least two different instances when minors were housed with adults. Mr. Dvorocsik, a former inmate of the jail testified about an instance when it was the inmates who informed the guards that a certain prisoner housed on their floor was a minor and it was as a result of that information that the minor was moved.

The Sheriff testified that he was unable to comply with the terms of the stipulation with respect to the classification of inmates, and he maintains that he has done what he can to be as close to compliance as possible. The court does not agree. No adequate procedure has been established for determining the proper classification of each inmate as he is admitted to the jail. No concerted and constant attempt has been made to transfer inmates who cannot be properly housed within the existing facilities of the jail. As was noted above, the Sheriff, aware that the jail was not in compliance with the order as entered by Judge Gurfein, made no communication to the court for clarification of the order or to be relieved of his responsibilities under it. To the extent he was able to comply without effort, he did so. Otherwise, he willfully continued to operate the jail without properly classifying the inmates.

### 2. Inmate Personal Hygiene

The stipulation required that the inmates receive specific items of clean bedding and that necessary toilet articles such as shampoo and deodorant be available by purchase or otherwise. White goods and institutional clothing were to be exchanged at least weekly and blankets, mattresses and pillows were to be checked and aired frequently. When an inmate was discharged, all his bedding was to be removed from the housing area and laundered, cleaned or repaired as necessary before being reissued. Each inmate, health permitting, was to bathe immediately upon admission, and an adequate supply of water at a suitable temperature was to be available at all times in the showers. In addition, the stipulation incorporated the requirements of 7 N.Y.C.R.R. § 5100.6. The statute requires that items such as soap, razors, toothbrush and toothpaste be furnished to all prisoners as needed. The testimony showed that the jail did not conform to these standards and that this failure was willful.

I find that the inmates do not receive the required bedding, linen and clothing nor are they afforded an adequate opportunity to bathe themselves. There are no written procedures or other guidelines to instruct the guards on duty as to the personal articles a newly-admitted inmate will receive. The Sheriff testified that there is a standing order that inmates be given the proper bedding, but he did not know whether or not the order was complied with and could only assume that the guards were informed of the requirement by their superiors. The Sheriff admitted that blankets and pillows are not necessarily laundered before being reissued and did not know whether mat-

tresses were cleaned upon being returned by a departing inmate. The mattresses are generally without covers.

Inmates do not regularly get showers upon admittance, nor are they decontaminated. There was considerable uncontradicted testimony that although the water temperature is generally suitable for bathing, there are frequent incidents when inmates are scalded by unexpected bursts of hot water.

### 3. Health Services

The stipulation contained several requirements with respect to inmate health services. Each inmate in continuous custody at the jail for 14 days or more was to be examined by a physician. Any inmate admitted to the jail for public intoxication or complaining of or evidencing any illness or disorder requiring prompt medical attention was to be examined by a physician at the time of admission or as soon thereafter as possible. The jail was to provide adequate rooms, equipment and supplies for conducting physical examinations and for treating emergencies and minor illnesses and injuries. The jail was required to arrange quarters for inmates too ill to remain safely in the general jail population but not so ill as to require hospitalization. Facilities or arrangements for curative and preventive dental care were ordered. The jail was directed to afford any inmate suffering from any chronic condition appropriate treatment and care irrespective of his status or the anticipated length of his confinement. The stipulation also incorporated the requirements of 7 N.Y.C.R.R. § 5100.11, which includes among other things requirements pertaining to proper storage and control of drugs. The statute also requires that to the extent possible facility personnel be trained in first aid and emergency life saving techniques.

The court finds that the provisions of the stipulation with respect to inmate health services were continually and willfully violated. The jail has had a series of part-time physicians, who have never been informed of the stipulation entered into in this mat-

ter and who have received little guidance or support from the Sheriff. Although the jail physician informed the Sheriff of the great need for psychiatric, psychological or counselling services within the jail, the Sheriff was not interested. This is true despite the fact that the New York State Commission on Correction directed the Sheriff to provide the services of a professional social worker. During an interview with Mr. Swiderek, a correctional facility review specialist, Sheriff Quinlan asserted that a social worker had been visiting the jail, but all attempts to verify that fact through visitors' logs and conversations with officers and inmates were unsuccessful. Furthermore, Dr. Newman, Commissioner of Mental Hygiene, informed Sheriff Quinlan in early 1975 that his department could provide on a full-time basis whatever mental services the jail needed without any additional cost to the Sheriff's department. These services included a psychiatrist or a psychiatric social worker. The Sheriff never took advantage of this opportunity. As of the date of the hearing no arrangement had been made or even attempted to provide full-time mental health services at the jail. Arrangements have been made, however, for twenty inmates to visit the Mental Health Center over the past year, but this is not adequate given the present needs of the jail population. Although there was testimony that legislative and executive authority were needed to assign a person to the jail, there is no evidence that the Sheriff made anything more than a perfunctory attempt to secure compliance with the requirement that he provide mental health services in the jail.

The examination and treatment facilities at the jail have not been improved since the issuance of the order, and the Sheriff has conceded that they are inadequate. There is a small examining room for the male patients containing a desk, chair, cabinet, sink, old dentist's chair and old examining table. There are no facilities for giving injections at the jail because proper storage for syringes is not available. Only the most rudimentary facilities are available for the women. There is no examining room in the

women's quarters; no gynecological examinations could be given although there are a number of pregnant inmates. There was some testimony that an examining table with stirrups was installed in the matron's quarters. This represents an improvement over the prior situation, but does not remedy the severe lack of proper treatment facilities in the jail.

As a result of the lack of facilities, it has been necessary to rely heavily upon community medical services. This makes the availability of transportation crucial. Nonetheless, transportation is often not available or is delayed. Inmates frequently miss appointments, and it can take as long as a month to have one rescheduled. The court finds that inmate access to community clinics is hampered by the unavailability of transportation and personnel and by the absence of adequate procedures, particularly in emergencies.

Emergency procedures within the jail are woefully inadequate. The staff generally is not trained to apply first aid and emergency life saving techniques. There have been two recent suicides within the jail. Neither were cut down immediately upon being discovered, and no emergency first aid was attempted. During the investigation of one such incident it was discovered that the oxygen tanks in the jail resuscitator were empty and that it would take two jailers approximately ten to fifteen minutes to replace them. It was also demonstrated that the jail staff is not properly trained to use the resuscitator. The resuscitator is kept in the admissions area in the basement although the inmates with medical and emotional problems, who are the ones likely to need it, are normally housed on the third floor. The Sheriff testified that in his opinion it would take three minutes to get the resuscitator to the third floor in an emergency; however, this requires that advance notice be given to unlock the doors through which the machine must pass. There are similar problems with fire extinguishers; many are inoperative and the staff is unfamiliar with their use. There is a serious problem with respect to evacuation of the

jail in case of fire. No access or escape provisions have been formulated for the jail which is not fire-resistant.

Dental care has become less available since the 1973 order and preventive care has never been provided. Dr. Katz, who has been providing dental care to inmates at the jail for about five years, donated a dentist's chair, a spotlight and dental instruments. He was never apprised of the full extent of the 1973 court order with respect to dental care. In 1974, he was notified that the jail could no longer afford to provide for his weekly visits to the jail to prescreen the inmates who requested dental care. Inmates who request to see the dentist are scheduled as time permits. There is no method for screening the inmates or for determining whether a certain inmate has a problem which should get priority. The net result is that there are certain inmates who are unable to see the dentist or who have to wait a long time to do so. There is also considerable difficulty and confusion surrounding the authorization of costly dental procedures. The dentist has no guidelines for determining which procedures require authorization, and when authorization is requested, it can be as long as six months or more before a decision is made.

There is a serious problem with drugs at the jail. The storage, distribution, control and in some instances the prescription of medicine is entrusted to members of the jail staff who have very little experience in dealing with drugs. As a consequence, the abuse of drugs by some inmates and the inability of others to obtain proper medication at appropriate intervals have been observed and are found by this court. Inmates are able to store drugs in their cells and inmates who are not officially receiving medication often appear to be under the influence of drugs. There was testimony that in September 1975 a bottle of Darvon was found in an unlocked cabinet in the admissions office. Approximately three weeks later the entire contents of the bottle were gone. A perpetual inventory of the drugs in the jail was never established despite the recommendation of the medical

officer. In May 1975, the Sheriff expressed his concern over the enormous amount of medication prescribed by the jail physician. At that time approximately 30–50% of the inmates received sleep medication and approximately the same percentage received tranquilizers. Nevertheless, despite the seriousness of the problem, no steps were taken to explore or alleviate it. The procedures for dispensing medication and for storing medication trays before distribution invite trouble and could easily be modified without expense to the Sheriff's office.

All newly admitted inmates do not receive physical examinations as is required by statute. The stipulation required that inmates who were confined to a cell apart from other inmates or who were put on a restricted diet were to be visited by a physician during each twenty-four hour period that the confinement or restricted diet continued. This requirement has been totally disregarded. The jail physician was never even informed of it.

The Sheriff's disregard of the services of the Dutchess County Health Department as a method for evaluating the medical services of the jail and as a source of suggestions for improving the medical situation at the jail is further evidence of his failure to attempt to comply with the provisions of the stipulation. In December of 1974, Dr. Redmond of the County Health Department issued a report on jail medical services upon which no action has ever been taken. In his testimony at this hearing, Dr. Redmond made it clear that the biggest obstacle which prevented the Health Department from making a significant contribution toward improving the jail facilities was the lack of cooperation from the Sheriff's office.

#### 4. Food

The stipulation required that the kitchen, kitchen equipment, food storage and serving methods and sanitation meet the minimum standards prescribed by law for restaurants. It also specified that all persons working in and around the kitchen and serving and handling food meet restaurant health requirements. The stipulation provided that the public health authorities do regular inspections and that minimum nutritional standards be maintained for inmates who for religious reasons do not eat pork. The stipulation also incorporated the requirements of 7 N.Y.C.R.R. § 5100.10. The court finds there to have been an utter and willful failure to comply with these requirements.

The man in charge of the kitchen, William Hesselbach, was never informed that a court order had been entered with respect to the jail, nor was he apprised of the contents of it as it related to the kitchen. Examination of persons who work in the kitchen and in areas where food is served is on a hit or miss basis. No program of regular physical examinations appears to exist for them. The inmates who serve the food on the floors are not included when the jail physician conducts kitchen physicals.

There is little, if any, supervision with respect to the cleanliness of the kitchen workers and the clothing and linen they use. Inmates must be reminded to wear their white uniforms and many have been observed working in the kitchen area wearing their own T-shirts. Inmates wear their kitchen uniforms back to their cells and keep them there during off-duty hours. There is no procedure to prevent the inmate from wearing the uniform while off-duty. There are no regular bathing or washing procedures for the kitchen staff. Inmates who work in the kitchen do not shower before starting work; rather, it is expected that they shower on their tier in the evening after work. There is no regular procedure for insuring that any inmate even washes his hands upon entering the kitchen.

It is the court's conclusion that the kitchen does not provide a healthy or sanitary atmosphere within which food is prepared. None of the recommendations made by the Health Department of Dutchess County have been carried out. As was pointed out by Dr. Redmond in a letter to Sheriff Quinlan on August 12, 1975, many of the health violations could have been cured with a

minimal expenditure of county funds. The extent to which these problems have not been corrected evidence the lack of concern by the jail administration about a sanitary and healthy facility, not the results of a shortage of funds.

### 5. Recreation

The stipulation required that an outdoor recreation and exercise area become operational no later than January 1974. The court finds that there is no exercise area within the jail and the outdoor exercise area, the only area where physical exercise is possible, is not operated according to schedule. In the cold months it is not operated at all. The personnel of the jail have arbitrarily determined that inmates are not permitted to use the outdoor exercise area when the temperature is below 50 degrees even though jackets are available within the jail for the use of the inmates who wish to take physical exercises. As of the time of this hearing in February 1976 no inmate had had the opportunity to go outside since October 1975. The court finds this to be a willful violation of the requirements of the stipulation.

### 6. Communication

The stipulation contained several directives with respect to mail and the use of the telephone. Stationery for inmate correspondence was required to state accurately all restrictions on inmate correspondence. Sentenced inmates could be restricted in the number and classes of persons with whom they could correspond and in the frequency of that correspondence provided that such restrictions were communicated in writing to all such inmates. No such restrictions could be applied to non-sentenced inmates. Incoming mail could be read by designated personnel and censored solely for the purposes of protecting the safety and security of the jail. The sender of censored mail was to be identified to the inmate in writing. Censored mail was to be kept in a safe place and given to the inmate upon his release from the jail. Special correspondence, letters between inmates and certain

designated people such as attorneys, and members of the New York State Legislature or the New York State Commission of Correction was subject only to limited control. It could be examined to insure the absence of contraband but was to be sealed in the presence of the inmate and was not to be read or censored by prison officials. Incoming special correspondence could be opened and inspected for contraband in the presence of the inmate but could not be read or censored. The services of a notary public were to be made available to the inmates. The stipulation required that each inmate be informed that he was allowed to make one local telephone call without charge to communicate with an attorney, relative, employer or other individual. Inmates were to be permitted to make these calls from an area where security and privacy were maintained. Unsentenced inmates without counsel were to be provided as many phone calls as they required to obtain counsel. The stipulation also incorporated the provisions of 7 N.Y.C.R.R. §§ 5100.3(b), 5100.5.

The jail has not been administered in accordance with these requirements. Inmates are not advised that they may make one free telephone call upon admission to the jail and furthermore they are not informed of or treated in accordance with the stipulation's provisions or the lawful regulations and restrictions governing mail and telephone calls. Some mail has been left for considerable periods of time without being posted. Apparently, the inmates have unequal access to the telephone. Inmates are not always permitted to make telephone calls in private. None of these violations can be attributed to a lack of funds; rather, they are simply willful violations of the stipulation.

### 7. Reading Materials

The stipulation allowed inmates to receive any literature except that which jail personnel censored as threatening the safety and security of the jail. Any censored literature was to be identified in writing to the inmate, kept in a safe place and re-

turned to the inmate upon his departure from the jail.

The directive with respect to the safe-keeping of publications and other censored materials is apparently not followed at all. Mail is censored according to the Sheriff's own sense of what is pornographic. There are no standards, written or otherwise, which describe limitations on the reading materials allowed into the jail. The court views this as another willful violation of the terms of the stipulation.

### 8. Legal Assistance

The stipulation required that any inmate who was unable to secure counsel with respect to a civil or criminal matter be permitted to consult with other inmates. The court finds no conclusive evidence of any violations with respect to this provision. It should be noted, however, that inmates keep the few available law books in their cells thus effectively denying other inmates access to them.

### 9. Supervision and Discipline

In addition to certain directives which have been discussed above, the stipulation required constant supervision and observation for any inmate whose physical or mental condition requires them or who needs protection from other inmates. Any inmate who appeared dangerously violent or suicidal was to be examined immediately by a physician and if advisable be removed to a facility where proper care and supervision were available. A list of rules and regulations governing inmate conduct and listing standardized operating procedures which relate thereto was to be promulgated and prominently posted in each inmate housing area. Furthermore, the stipulation incorporated the requirements of 7 N.Y.C.R.R. §§ 5100.4, 5100.7 and New York Correction Law § 137(6) as made applicable to county jails by New York Correction Law § 500–k.

There has been a failure to comply with this section of the stipulation. There does not appear to be any adequate procedure for the segregation and observation of inmates who need special treatment for a mental and physical condition or who need protection from themselves or from other inmates. The jail physician does not visit or examine inmates who are confined to their cells, and there is no procedure for the jail physician to examine inmates who appear to be violent or suicidal. Inmates are not properly supervised in this jail nor are they adequately protected from themselves or from others. While there was some testimony to the effect that inmates were given rules and regulations when they were admitted to the jail, it is the court's belief that in most instances the rules and regulations have not been distributed to the inmates and they are not consistently applied. Actually, in their most recent form, they are contrary to the minimum standards set forth by the Correction Department and in the stipulation.

### 10. Alterations and Repairs to Physical Plant

The stipulation required that each cell, including isolation cells, be provided with a light fixture sufficient to permit reading and writing without causing eye strain. Adequate heating and ventilation were to be provided and all malfunctions and leaks in plumbing were to be repaired immediately without regard to the cause of the malfunction or leak.

There has been a general neglect of the maintenance of the physical plant which in the opinion of this court threatens the health and safety of all persons within the jail and which persists in spite of numerous critical reports from the New York State Commission of Correction and the Dutchess County Board of Health. The alterations and repairs to the physical plant which were stipulated to and became a part of the order as indicated in paragraphs 9a(3), 10a, 10b, and 10c have not been complied with. There was testimony that the sink in a cell in which inmates were regularly housed has been inoperable for several months. Although lighting fixtures of a particular type will be approved by the State Correction Commission for use in cells, the Sheriff has failed to make any inquiry with respect

to their installation. Where there is utter failure to attempt to provide for a certain item or to present a plan for its installation to the County Legislature, the Sheriff cannot blame his failure to act in accordance with the stipulation on the failure of the Legislature to appropriate funds for the renovation of the jail.

There was considerable testimony with respect to the problems of temperature regulation in the jail. The heating system is very difficult to control and provides extremes of temperature that are uncomfortable and unhealthy. No system for ventilation has been installed. This causes particular problems in the showers where stagnant water accumulates and wall and floor areas are deteriorating severely. This is another area in which the Sheriff has tried to rely on the failure of the County Legislature to appropriate funds for renovation; however, as the Health Department and Commission inspection reports and testimony demonstrate, minimal expenditures would be adequate to correct or at least to improve the unsafe and annoying conditions.

### 11. Implementation

■ The stipulation directed the Sheriff to submit within 30 days of the approval of the stipulation a plan to implement the terms of paragraphs 3, 5 and 10 of the stipulation. No such plans for compliance with any of the terms of the stipulation have been submitted to the court for approval. The Sheriff has had a full knowledge and a full understanding of the terms of the stipulation, but he has failed to comply with the terms of the stipulation and order, or to demonstrate his inability to comply with any of its terms. The Sheriff defends his failure to do so in part by alleging a failure by the plaintiffs' attorney to request his compliance. Even if the court gave credence to this unsupported assertion, it would be no excuse. The court ordered that the Sheriff submit such a plan; the plaintiffs' attorney was under no obligation to request compliance. Furthermore, the evidence submitted by the Sheriff

himself contradicts his contention, and the court fully credits the evidence presented by plaintiffs' counsel that in fact the Sheriff was repeatedly notified of his obligation to submit a plan and of the consequences of his failure to do so.

■ While the order provides for willful contempt, it is horn book law that willfulness is not necessary in a civil contempt proceeding. There is no necessity for showing willfulness. However, it has been amply demonstrated above, and the court so finds, that with respect to most of the items which are involved in this hearing, the Sheriff is in willful contempt.

Furthermore at the very time the Sheriff entered into a stipulation in which he agreed to do something about the lighting in the cells, he actually believed that he would not be able to make any of the changes because of the Correction Commission's general requirements. To have done so amounts to a fraud on the court and is indicative of the Sheriff's approach to his obligations as imposed by the court in the original order.

Throughout these proceedings Sheriff Quinlan has been represented by counsel. Furthermore, he has been advised time and time again by Mr. Levin, the attorney for the plaintiffs in this matter, that unless he complied with the requirements of the stipulation, a contempt proceeding would be brought. At this point, it seems to me that the Sheriff has no complaint that he was not advised of the nature of the proceedings which could be brought against him and which ultimately were brought against him after the exercise of great patience.

■ I find no necessity for making the officers and legislators of the County of Dutchess parties to this proceeding. In the first instance the Sheriff prepared his own budget requests, and he should have incorporated in those budget requests whatever was necessary for him to comply with the stipulation. If he has not done so it was because of a willful failure to do so rather than through neglect or from a fear that the budget request would not be approved.

He bases his whole defense upon the fact that he could not obtain the necessary funds from the Dutchess County Legislature. However, a reading of this record indicates that the Sheriff made only one application with respect to obtaining funds and that was in the form of a massive capital improvement program involving some two million dollars. If the legislature in fact disapproved of this request, it would in no way exonerate the Sheriff for failure to perform under the terms of the stipulation. There is no other evidence in the record that the Sheriff has at any time made specific requests for the other items of physical repair which were required, namely, renovating the heating and ventilation system, and the shower; repairing and securing electrical boxes which were exposed; and painting and generally cleaning up the whole of the jail. Furthermore, the Sheriff has failed to take any action with respect to those items for which no or minimal expenditures were required.

■ Court orders are not to be neglected. They are to be meticulously obeyed, and unless the Sheriff, who is the chief law enforcement officer in the county, is willing to comply with such orders, we cannot expect the ordinary citizen to comply with them. I find that the Sheriff in this case is not only in contempt of the court order but that in respect to the items mentioned, he is willfully in contempt.

I recognize that these jail facilities were built at a time when jail populations were not so large and so varied as they are today and that we did not have the number of disturbed persons who might be in the jails by reason of the fact that jail populations were lower than they are now. I also recognize that we must do the best we can with what we have since capital funds are at this time very scarce particularly in counties of the size of Dutchess County. However, I have been informed by the state department investigators that it is possible for this jail to be in classification and I believe it is possible for the jail to be in compliance with the order. The administration of the jail at this time is shocking.

It shows a completely insensitive attitude on the part of the Sheriff and on the part of his principal administrator and a total lack of concern.

■ As a consequence of the finding of contempt I first assess a fine against the Sheriff in the amount of five hundred dollars ($500). I will also assess against the Sheriff the plaintiffs' attorneys' fees and expenses with respect to this proceeding. Thereafter, I direct that the Sheriff will comply with the terms of the stipulation within thirty (30) days or that a plan for compliance with this decision and with the stipulation be filed with the court within those thirty (30) days. Thereafter and unless the Sheriff does so comply and does present to this court a plan for compliance with the stipulation there will be assessed against the Sheriff an amount of fifty dollars ($50) per day as a fine for continuing contempt of this court's order until such time as his plan is filed and approved by this court.

I will appoint the director of the Dutchess County Board of Health as the monitor in this matter, and I will expect the Sheriff to furnish to the court and to the attorney for the plaintiffs a monthly report as to the manner in which the stipulation is being complied with. The director of the board of health is to make monthly examinations of the jail and to report to the court that the report of the Sheriff is in fact a true and correct report of the actions being taken by the Sheriff to remedy the various difficulties which have been noted in the decision herein. In the event that it is the finding of the director of the board of health of Dutchess County or of this court that the stipulation is not being complied with, the Sheriff will again be subjected to a fine in the amount of fifty dollars ($50) per day until such time as the deficiencies noted by the director of the board of health have been corrected, and in the event that the Sheriff persists in these actions this court upon due notice will hold a hearing to determine whether or not the Dutchess County jail should be closed.

With respect to Sergeant Farmer and the other defendants, the court finds that they have no effective control over what transpires in the Dutchess County Jail. Therefore, the court finds no contempt of the original order with respect to them.

Within three weeks of the filing of this opinion, the plaintiffs shall submit to the court a petition and supporting affidavits in support of their claim for attorneys' fees and costs.

Submit Order.